**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

**JACOB VARNER,**

|  |  |
|---|---|
| ELECTRONICALLY FILED |
| Sep 08 2022 |
| U.S. DISTRICT COURT |
| Northern District of WV |

                **Plaintiff,**

**v.**                                                    **Civil Action No.**
                                                        **3:22-cv-156 (Groh/Trumble/Sims)**
**TIMOTHY TIBBS,**
**MICHAEL COSTELLO,**
**SHANNON SAMS,**
**and SUPERINTENDENT JOSEPH WOOD**

                **Defendants.**

## COMPLAINT

1.      This case arises from the excessive use of force against Plaintiff at North Central Regional Jail (NCRJ) by a correctional officer, as well as from violations of his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution. In the action at hand, without provocation, Defendant Costello wrongfully used highly concentrated pepper spray against Plaintiff while he was locked in a cell and presenting no threat to himself, others, or the facility. Defendants Costello, Tibbs, and Sams further violated Plaintiff's constitutional rights by depriving him of a liberty interest without due process and subjecting him to conditions that amount to cruel and unusual punishment.

2.      Plaintiff Jacob Varner, who was, at all relevant times herein, an individual incarcerated at NCRJ, located in Greenwood, Doddridge County, West Virginia, submits this Complaint, pursuant to 42 U.S.C. § 1983, for violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution and state law. Mr. Varner seeks monetary damages to compensate him for his injuries, and injunctive and declaratory relief to ensure he is not subjected to such violations in the future.

**PARTIES**

3.      Plaintiff Jacob Varner is, and at all relevant times herein was, a citizen of the United States in the Custody of the West Virginia Division of Corrections and Rehabilitation (WVDCR) and incarcerated within NCRJ.

4.      Defendant Joseph Wood is the Superintendent of NCRJ. In that capacity, Defendant Wood is tasked by law with the care and custody of Mr. Varner and all other prisoners incarcerated at NCRJ. Defendant Wood is vested with executive authority and responsibility for the safe staffing, administration, operation, and control of NCRJ, including the oversight of NCRJ employees and the authority to promulgate, amend, and implement all the policies and procedures within NCRJ to ensure constitutional confinement and treatment of those individuals incarcerated within. At all relevant times, Defendant Wood was acting under the color of state law. Defendant Wood is named solely in his official capacity for the purpose of seeking injunctive and declaratory relief and is named solely in his individual capacity for purposes of seeking monetary relief.

5.      Defendant Michael Costello was, at all relevant times herein, a correctional officer employed at NCRJ. At all times alleged herein, Defendant Costello was acting under the color of law and within the apparent scope of his role as a correctional officer employed at NCRJ. Said Defendant is sued in his individual capacity for purposes of seeking monetary relief. Defendant Costello is only sued in his official capacity for injunctive and declaratory relief.

6.      Defendant Timothy Tibbs was, at all relevant times herein, a correctional officer employed at NCRJ. At all times herein, Defendant Tibbs was acting under the color of law and within the apparent scope of his role as a correctional officer employed at NCRJ. Said Defendant

is sued in his individual capacity for purposes of seeking monetary relief. Defendant Tibbs is only sued in his official capacity for injunctive and declaratory relief.

7.      Defendant Shannon Sams was, at all relevant times herein, a captain employed at NCRJ. Upon information and belief, in her position as Captain, Defendant Sams was responsible for oversight of Defendants Costello and Tibbs. At all times herein, Defendant Sams was acting under the color of law and within the apparent scope of her role as a captain employed at NCRJ. Defendant Sams is sued in her official capacity for injunctive and declaratory relief. Defendants Sams is named in her individual capacity for purposes of seeking monetary relief.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the federal claims presented in this action pursuant to 28 U.S.C. §§ 1331, 1343 and under the Court's authority to decide pendant state law claims.

9.      Declaratory relief and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

10.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the events that support the allegations occurred in this judicial district, and because Mr. Varner is incarcerated in this judicial district.

## STATEMENT OF FACTS

11.      Mr. Varner arrived at North Central Regional Jail on April 1, 2022.

12.      Upon his arrival, Mr. Varner was housed in Unit A1, Cell 8, and remained housed in this unit for approximately one month following his arrival at North Central.

13.      There was pre-existing damage to Pod A1 when Mr. Varner was placed there; for example, numerous cell doors were damaged and could not be locked, and one light was severely

damaged, allowing access to the wiring within. Certain call boxes[1] on the pod were not operational.

14.    Prior to the events described below, housing on Unit A1 was a normal carceral experience and Mr. Varner experienced no major issues while living on Unit A1.

15.    On May 3, 2022, a correctional officer entered Pod A1 and discovered that several individuals had used the wiring in the broken light to start a fire to warm their food. The correctional officer stated that the pod would have its gym privileges revoked.

16.    One individual housed on the pod (not Mr. Varner) entered into a verbal altercation with the correctional officer.

17.    This correctional officer then departed Unit A1 and returned with Defendant Costello. At this time, another individual housed on Unit A1 shouted at Defendant Costello.

18.    Additional officers then entered the unit, including Defendant Tibbs and another correctional officer, who carried a pepper ball gun.

19.    Unit A1 was then locked down; all individuals housed in cells with broken doors or other damage were placed in handcuffs. Upon information and belief, although all individuals are assigned to certain cells, individuals rarely follow those housing assignments, as the cells are often already full when they arrive on the pod, and they then stay in a cell where they can find room. Although Mr. Varner was assigned to Cell 8, he was staying in Cell 13 on May 3, 2022. The light in Cell 13 was damaged, and so he was handcuffed along with roughly half the inmates on Unit A1.

---

[1] Intercom boxes contained in cells to allow contact with correctional officers.

20.     Those who had been housed in cells with damaged doors were moved from Unit A1 to Unit A5. Mr. Varner was placed in Cell 14 on A5, where he was strip-celled[2] down to boxers for 24 hours.

21.     While on Unit A5, Defendant Tibbs falsely told Mr. Varner that two shanks, or homemade weapons, had been found in his cell on A1, and that he would be getting charged with outside charges for these items. However, Mr. Varner received no write up for this supposed incident, and has heard nothing about the alleged contraband items since this time.

22.     The first night the individuals housed on A1 were moved, two inmate trustees[3] entered the cells on A1 and removed individuals' personal items, including personal papers, hygiene items, and food. Upon information and belief, the correctional officers knew this had occurred. Mr. Varner's personal items, including his legal papers, were taken.

23.     After two nights on Unit A5, Mr. Varner and the rest of the individuals that had been taken from A1 on May 3 were moved to Unit A8, where the other half of those housed on Unit A1 had been moved earlier.

## Mr. Varner Is Subjected to Excessive Use of Force by Defendant Costello

24.     After being moved to Unit A8, Mr. Varner was placed in Cell 13 with Virgil Lamb and their third cellmate.

25.     Mr. Varner and his cellmates were without toilet paper in their cell on A8 for several days.

26.     On May 6, 2022, while Defendant Costello was delivering dinner trays, Mr. Lamb walked up to the door of Cell 13 and requested toilet paper.

---

[2] "Strip-celling" is the practice of placing individuals in cells that are empty with the exception of a mat, with the individuals themselves stripped of their clothing other than underwear.
[3] Inmate trustees are inmates trusted by the jail administration to perform certain duties in exchange for receiving privileges above and beyond other inmates.

27.    Defendant Costello then told Mr. Lamb that he would get them toilet paper when he felt like it.

28.    Mr. Lamb stated, "That ain't right, man," and then went to sit on his bunk.

29.    Following Mr. Lamb's statement, which was not accompanied by any threats or aggressive actions, Defendant Costello dropped the bean hole.[4]

30.    Defendant Costello then deployed multiple bursts of oleoresin capsicum (OC pepper spray) into the cell, spraying Mr. Varner, Mr. Lamb, and their third cellmate. After Defendant Costello deployed OC from his own cannister, another correctional officer gave his can of OC to Defendant Costello, who then deployed the second can of OC into Mr. Varner's cell as well.

31.    At the time Defendant Costello deployed the pepper spray, Mr. Varner and his fellow inmates were fully compliant, were securely locked in the cell, and presented no immediate threat or risk to the safety of themselves or others, or to the property of NCRJ.

32.    Defendant Costello did not give any order prior to deploying the OC spray, nor did he provide any warning.

33.    Upon information and belief, Defendant Costello deployed each spray can for approximately five seconds.

34.    Mr. Varner and his cellmates felt as though they were unable to breathe. The third individual in the cell, who is diabetic and has a heart condition, began hitting the medical call box in the cell and screaming that he was unable to breathe.

35.    Mr. Varner heard Defendant Costello laugh and say, "I bet you can't."

---

[4] The bean hole is the slot in a cell door through which food, mail, and other items are passed through. Each bean hole has a covering that can be raised and lowered, as well as locked from the outside.

36.     Mr. Varner then attempted to place his hands through the bean hole to allow Defendant Costello to cuff him.

37.     Defendant Costello slammed the bean hole shut on Mr. Varner's hands and stated to the other correctional officer that they were going to leave Mr. Varner and his cellmates in the cell because "they aren't cuffing up."

38.     Defendant Costello and the other correctional officer returned after several minutes and ordered Mr. Varner, Mr. Lamb, and their third cellmate to cuff up.

39.     Upon information and belief, Defendant Costello failed to obtain a handheld video camera, as required by WVDCR Policies 313.02 and 314.02, to record the removal of Mr. Varner and his cellmates from their cell following the use of force.

40.     Mr. Varner and Mr. Lamb were then placed into the bird cages[5] in Unit A5.

41.     After being placed in the bird cage, Mr. Varner began to experience a panic attack. He felt as though he was unable to breathe.

42.     As he was suffering from a panic attack, unable to properly see or breathe, a correctional officer stated, "If you spit on my floor, I'll spray you again."

43.     A nurse came to speak with Mr. Varner, and when he explained that he was suffering from a panic attack, the nurse spoke to Defendant Costello and told him that Mr. Varner needed to be let out of the cage and taken to the showers.

44.     Defendant Costello then took Mr. Varner out of the cage, cuffed his hands behind his back, and led him through Unit A5, through Unit A6 to the showers on Unit A7.

---

[5] A "bird cage," also known as a temporary holding cage or THC, is a free-standing, barred cage large enough for one individual to sit or stand inside. These cages are placed at regular intervals throughout the various areas of the jail facility, including in the hallways in the units on A Pod.

45. As Defendant Costello was leading Mr. Varner to the showers, Mr. Varner turned slightly to thank the nurse for her assistance, though he did not pull away from Defendant Costello or resist in any way.

46. Defendant Costello shouted at Mr. Varner for getting OC and snot on Defendant Costello's uniform and began pulling Mr. Varner's wrists up toward his neck, although Mr. Varner was not resisting.

47. Mr. Varner began begging Defendant Costello to stop.

48. As they entered the dayroom in either Unit A6 or A7, Defendant Costello shoved Mr. Varner into a wall in the dayroom several times, still pulling his cuffed wrists up toward his neck.

49. At the time that Defendant Costello used force against Mr. Varner, Mr. Varner was fully compliant, with his wrists cuffed behind his back, presenting no immediate threat or risk to the safety of himself or Defendant Costello.

50. Defendant Costello did not give an order or directive prior to this use of force on Mr. Varner, and Mr. Varner was not resisting Defendant Costello in any way.

51. When Mr. Varner was returned to Cell 13 on A8, he found that their clothes, bedding, and mats had been taken. Although the floor had been lightly mopped, there was still residue from the OC in the cell.

52. Mr. Varner and his cellmates were forced to sleep on the concrete floor with no bedding or mats.

53. On the morning of May 7, 2022, a correctional officer came to deliver breakfast and noticed that Mr. Varner and his cellmates were without bedding or mats. She stated that she

"figured" that Defendant Costello would do something like this, and then had trustees bring Mr.

Varner and his cellmates new mats, blankets, and bedding.

**Mr. Varner Is Subjected to Segregation Without Proper Due Process and to Conditions
Amounting to Cruel and Unusual Punishment by Defendants Costello, Tibbs, and Sams**

54.     Mr. Varner never received a write up nor a disciplinary hearing related to any

events that precipitated his placement in segregation on A8 on May 3, 2022.

55.     Although Mr. Varner's inmate file contains a write up related to the incident in

which he was sprayed by Defendant Costello on May 6, 2022, he did not receive this write up

until the first week of July 2022, and no disciplinary hearing for any incident was held until on or

about July 12, 2022.

56.     Pursuant to DCR Policy Directive 325.00, disciplinary rule violations may be

punished in a variety of ways, including placement in segregation and loss of privileges.

However, "All Class I, II, and III disciplinary rule violations shall be prosecuted and heard by a

Correctional Hearing Officer." WVDCR Policy Directive 325.00 6.01 (1). Employees witnessing

or determining the occurrence of a rule violation must document that violation via an Incident

Report, which must describe the date, time, location, and other pertinent details of the event.

57.     Although an individual may be placed in detention prior to being served with a

Disciplinary Incident Report, they must not be detained for longer than 72 hours unless a

Disciplinary Incident Report is served charging them with a rule violation. *Id*. at 6.04(a), (d).

58.     Disciplinary hearings must be scheduled no sooner than 24 hours after serving the

Disciplinary Incident Report but should be scheduled no later than seven days after the

Disciplinary Incident Report has been served. *Id*. at 6.07 (c)-(d).

59.     Even when loss of privileges is determined to be an appropriate punishment for a

rule violation, this punishment is limited. Loss of privileges may not entail loss of telephone calls

to and from attorneys; loss of access to hygiene products and writing materials through the commissary; or loss of access to one hour recreation period daily.

60.     Upon information and belief, North Central Regional Jail was running—formally or informally—a "Step Down Program" in segregation that began in early May 2022.

61.     Upon information and belief, there were three levels to this Step-Down program:

a.  Individuals spent two weeks at Level I, during which they received no phone access, including to make phone calls to attorneys, and no access to commissary; on this level, individuals were locked down 24 hours a day, and did not receive regular access to required out-of-cell recreation.

b.  Individuals then spent two weeks at Level II, during which they may have one phone call per week and $10 per week to spend only on hygiene and writing products from commissary; on this level, individuals continued to be locked down 24 hours a day, and did not receive regular access to required out-of-cell recreation.

c.  Individuals then moved to Level III, during which they were moved to pod A1 and could spend two hours per day out of their cells. They could have $30 per week to spend on commissary.

62.     Upon information and belief, this program was implanted without any due process to the individuals placed on the program.

63.     Neither Mr. Varner nor the other inmates placed in segregation from Unit A1 were ever clearly informed of the rules of this new segregation program, which, upon information and belief, was started on Unit A8.

64.     Upon information and belief, Defendants Sams, Tibbs, and Costello were frequently assigned to work in the segregation unit, particularly on Unit A8.

65.    Upon information and belief, Defendant Sams has referred to this segregation program as "the new world order."

66.    Upon information and belief, Defendant Tibbs has referred to this segregation program as "the den of lost souls."

67.    While housed in segregation on A8, Mr. Varner was subjected to abusive language by Defendants.

68.    Mr. Varner was denied access to appropriate hygiene products while in segregation on A8. The hygiene products previously in his possession were taken from his cell on A1. Mr. Varner was not supplied with basic hygiene products such as toilet paper or toothpaste.

69.    When inmates requested such items from members of correctional staff, the staff members informed them they would provide them items but then failed to do so.

70.    After his initial arrival on Unit A8, Mr. Varner was denied access to a shower for approximately ten days, save for a shower following the deployment of OC spray by Defendant Costello on May 6, 2022, in violation of policy, which requires inmates to shower at least three times per week.

71.    Mr. Varner was also denied access to clean linens and clothing while in segregation on A8. He was not given clean clothing and was forced to wear the same clothing for a period of nearly three weeks, in violation of WVDCR Policy 407.01. Mr. Varner was forced to use the same sheets and blanket from May 7, 2022, when he was provided new bedding after his previous set was contaminated with OC spray following Defendant Costello's use of force, to early July, when he was finally provided with new bedding.

72.     Mr. Varner and the other individuals in segregation on A8 have been denied required access to recreation, in violation of policy, which requires at least one hour of exercise per day. Mr. Varner received recreation approximately six times between May 3, 2022, and June 9, 2022.

73.     When Mr. Varner and other individuals on segregation on A8 did receive recreation time, it was during the middle of the night.

74.     Mr. Varner's writing materials were taken from his cell in A1. Once he was placed in segregation on Unit A8, Mr. Varner was initially provided with only a single sheet of paper, pen, and a single envelope on or about May 15, 2022, nearly two weeks after being placed on segregation, in violation of WVDCR Policy 503.00.

75.     The air conditioning on A Pod was also not in proper working order. Unit A8 appeared to not have working AC most of the time, with exhaust fans being used to provide ventilation to the unit.

76.     Mr. Varner was also subject to retaliation after meeting with undersigned counsel. Defendant Tibbs threatened Mr. Varner and other individuals with whom undersigned counsel met, stating that he had requested they be transferred out of NCRJ. Furthermore, when Mr. Varner or other individuals housed with him made reasonable requests, the requests were denied and the individuals are told by Defendants to "tell Lamb's[6] lawyer."

77.     On June 6, 2022, Mr. Varner was moved to Level III on Unit A1.

78.     The AC on Unit A1 was not working properly when Mr. Varner was moved to that unit on June 6, 2022. The exhaust fans were not turned on, and the unit was very warm, in

---

[6] Mr. Virgil Lamb was, like Mr. Varner, assigned to Unit A-1 when the unit was locked down and moved to segregation on Unit A-8. Mr. Lamb was one of the first individuals to reach out to undersigned counsel related to the claims stated in this and other complaints.

violation of WVDCR Policy 203.00. This situation continued until the AC was fixed on the evening of June 8, 2022.

79.     When Mr. Varner first arrived on Unit A1 on June 6, 2022, the kiosk[7] in the day room was operational. However, upon information and belief, once Defendant Costello realized that individuals on the unit were accessing the kiosk, Defendant Costello locked the unit down and sent maintenance to shut off the kiosk.

80.     Mr. Varner was housed in Cell 10 on Unit A1 from June 6 to June 21, 2022. There was no call box in Cell 10, leaving Mr. Varner without any way to notify correctional staff if there was a medical or other emergency in his cell.

81.     Mr. Varner has not yet received any of his personal or commissary items that were seized from his cell on Unit A1 on May 3, 2022.

82.     On June 21, 2022, Mr. Varner was released from segregation back to general population (Gen Pop). Mr. Varner was subjected to 49 days in segregation, despite not having received a write up or disciplinary hearing during this period.

**<u>Mr. Varner Is Once Again Subjected to Segregation Without Proper Due Process</u>**

83.     On June 21, 2022, after being released from 49 days on segregation without proper process, Mr. Varner was assigned to Unit B2, a general population unit.

84.     When he arrived at Unit B2, however, he discovered that the unit was already overcrowded, with three inmates in every one-man handicap cell on the bottom tier and three inmates in every two-man cell on the top tier.

---

[7] Kiosks are located on various units throughout the facility, and allow individuals to use certain applications, including sending email through NCRJ's third party provider. When a kiosk is operational, individuals are able to use their inmate number to log into their accounts and access certain communications, including email.

85.    The inmates already housed on Unit B2 told Mr. Varner that he had to leave due to the overcrowding and that, if he wanted to stay, he would have to fight and beat someone for their spot on the unit.

86.    Because Mr. Varner did not wish to fight anyone, he waited until the next time a correctional officer came onto the unit and then informed them that he was unable to live on the unit.

87.    The correctional officer took Mr. Varner to the front of the facility, near booking, and placed him in one of the bird cages there. The correctional officer then went to speak with Defendant Sams, who was located in one of the offices near the cages.

88.    Mr. Varner attempted to explain to Defendant Sams that he had asked to be removed from Unit B2 due to the threat of violence from other inmates, but Defendant Sams ignored Mr. Varner, stating that if he did not want to live on Unit B2, he would go back to segregation for 60 days.

89.    Defendant Sams told Mr. Varner that his two options were to return to Unit B2 or go to segregation for 60 days for refusing housing.

90.    Mr. Varner again attempted to explain that he had been threatened if he remained on Unit B2, but Defendant Sams refused to listen to him.

91.    Defendant Sams then sent Mr. Varner back into segregation.

92.    Mr. Varner's inmate file contains a write up related to the events of June 21, 2022; however, he was not given this write-up until the first week of July. He did not receive a disciplinary hearing related to this write up until July 12, 2022.

**<u>Defendants Costello & Tibbs' Pattern of Excessive Use of Force</u>**

93.     Upon information and belief, Defendants Costello and Tibbs have deployed highly concentrated pepper spray on multiple other individuals incarcerated at NCRJ.

94.     Upon information and belief, Defendants Costello and Tibbs have threatened and intimidated numerous other individuals incarcerated at NCRJ.

95.     Upon information and belief, Defendant Sams is aware, or should be aware, of Defendant Costello and Tibbs' pattern and practice of using excessive force on individuals incarcerated at NCRJ.

96.     Upon information and belief, Defendant Sams has taken no actions to discipline Defendants Costello and Tibbs for this pattern of using excessive force, nor has Defendant Sams taken any steps to provide additional training to Defendants Costello and Tibbs, or otherwise curb Defendant Costello and Tibbs' use of excessive force.

97.     In her capacity as Captain, Defendant Sams knows, or should know, that the acts of Defendants Costello and Tibbs against Mr. Varner were unconstitutional.

98.     In light of the clear pattern of recent incidents of excessive uses of force by Defendants Costello and Tibbs against multiple individuals, including Mr. Varner, Defendant Sams knows, or should know, of Defendants Costello and Tibbs' repeated and unconstitutional excessive uses of force against individuals incarcerated at NCRJ.

99.     Defendant Sams' failure to stop the abusive and excessive uses of force by Defendants Costello and Tibbs, despite her actual knowledge of those occurrences, amounts to deliberate indifference to the care and safety of, and a tacit approval of such force against individuals incarcerated at NCRJ.

100.    Upon information and belief, Defendant Wood is aware, or should be aware, of Defendants Costello and Tibbs' pattern and practice of using excessive force on individuals incarcerated at NCRJ.

101.    Upon information and belief, Defendant Wood has taken no actions to discipline Defendants Costello and Tibbs for this pattern of using excessive force, nor has Defendant Wood taken any steps to provide additional training to Defendants Costello and Tibbs, or otherwise curb Defendant Costello and Tibbs' use of excessive force.

102.    In his capacity as Superintendent, Defendant Wood knows, or should know, that the acts of Defendants Costello and Tibbs against Mr. Varner were unconstitutional.

103.    Upon information and belief, as part of his responsibilities as Superintendent, Defendant Wood reviews all incident reports and investigations relating to allegations of excessive force.

104.    In light of the clear pattern of recent incidents of excessive uses of force by Defendant Costello against multiple individuals, including Mr. Varner, Defendant Wood knows, or should know, of Defendant Costello's repeated and unconstitutional excessive uses of force against individuals incarcerated at NCRJ.

105.    Defendant Wood's failure to stop the abusive and excessive uses of force by Defendant Costello, despite his actual knowledge of those occurrences, amounts to deliberate indifference to the care and safety of, and a tacit approval of such force against, individuals incarcerated at NCRJ.

**<u>Clear Violations of Mr. Varner's Eighth and Fourteenth Amendment Rights</u>**

106.    Defendant Costello clearly violated Mr. Varner's Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to an unreasonable and excessive use

of force. Defendants Costello, Tibbs, and Sams further violated Mr. Varner's rights under the Eighth Amendment by subjecting him to conditions amounting to cruel and unusual punishment, resulting in Plaintiff's pain and suffering. Defendants Costello, Tibbs, and Sams violated Mr. Varner's rights under the Fourteenth Amendment by subjecting him to disciplinary segregation that amounts to atypical and significant hardship.

107.    Defendant Wood's approval of practices such as those undertaken by Defendants Costello, Tibbs, and Sams violated Mr. Varner's Eighth and Fourteenth Amendment rights and proximately caused the constitutional injuries and harms suffered by Mr. Varner.

### Mr. Varner Suffers Injuries

108.    As a result of Defendants' actions, Mr. Varner has suffered physical injuries, as well as pain, anxiety, and severe mental and emotional distress, including lingering fear and trauma. Being sprayed with pepper spray placed Mr. Varner in incredible pain, including chemical burns on his skin.

109.    Mr. Varner breathed pepper spray into his lungs, which made it hard to breathe and impossible inhale through his nose after being sprayed. There was a strong burning sensation in his throat, and Mr. Varner began hyperventilating, leading to a panic attack.

110.    The spray got in his eyes, and Mr. Varner was unable to open his eyes for approximately 20 minutes following the spraying incident.

111.    Even following a shower, Mr. Varner's skin continued to burn. He experienced a burning sensation akin to a strong sunburn, "times ten," for the rest of the evening after being sprayed. The sensation continued into the next day.

112.    Mr. Varner also suffered physically due to Defendant Costello slamming him into the wall of the dayroom in Unit A6 or A7 and forcing his wrists up toward his neck.

113.    Following this incident, Mr. Varner's face was red and swollen.

114.    Mr. Varner still has a small scar on his wrist from when Defendant Costello forced his cuffed wrists up toward his neck.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE EIGHTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### EXCESSIVE FORCE
### (42 U.S.C. § 1983)

115.    Mr. Varner incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

116.    Defendant Costello, while acting under the color of law, violated Mr. Varner's Eighth Amendment right against cruel and unusual punishment, resulting in Plaintiff's pain and suffering.

117.    Defendant Costello violated Mr. Varner's federal constitutional right, as described and identified herein, by authorizing, committing, condoning, and/or failing to remedy the excessive and wrongful force, employed without efforts to temper, without provocation, and without justification against Mr. Varner on May 6, 2022.

118.    Defendant Sams and Wood, while acting in a supervisory capacity, explicitly and/or tacitly condoned the unconstitutional actions of Defendant Costello.

119.    The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment and prohibits deliberate indifference to excessive force that are unnecessary, unjustified, or applied with malicious and sadistic intent for the purpose of punishment and to cause harm.

120.    On May 6, 2022, it was clearly established that the use of mace, tear gas, or other chemical agents "in quantities greater than necessary for the sole purpose of infliction of pain"

violated the Eighth Amendment to the United States Constitution. *See Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008).

121.    By using force as described about without efforts to temper the severity of the force and for no justifiable reason, Defendant Costello purposefully or knowingly applied nontrivial force against Mr. Varner that was objectively unreasonable and amounted to punishment, in violation of the Eighth Amendment.

122.    The actions of Defendants Costello were committed under the color of state law, unreasonable, excessive, and deprived Mr. Varner of his clearly established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

123.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions in violation of the Eighth Amendment to the United States Constitution, Mr. Varner seeks to recover damages that compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Humiliation, embarrassment, and degradation; and

D.    All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

124.    Mr. Varner also seeks to recover, under 42 U.S.C. § 1983, the attorneys' fees and costs incurred during the course of this litigation.

125.    Mr. Varner additionally requests that this Court issue a declaratory judgment stating that conditions as set forth herein violated his rights under the Eighth Amendment to the United States Constitution.

126.    Mr. Varner continues to be detained at NCRJ and fears the possibility of once again be subjected to excessive use of force, and thus requests that this Court issue an injunction ordering Defendants to cease all unconstitutional policies and practices currently in effect at NCRJ.

127.    The actions or inactions of Defendants against Mr. Varner were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Varner, thereby justifying an award of punitive damages.

**COUNT II**
**VIOLATIONS OF THE EIGHTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**
**EXCESSIVE FORCE**
**(42 U.S.C. § 1983)**

128.    Mr. Varner incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

129.    Defendant Costello, while acting under the color of law, violated Mr. Varner's Eighth Amendment right against cruel and unusual punishment, resulting in Plaintiff's pain and suffering.

130.    Defendant Costello violated Mr. Varner's federal constitutional right, as described and identified herein, by authorizing, committing, condoning, and/or failing to remedy the excessive and wrongful force, employed without efforts to temper, without provocation, and without justification against Mr. Varner on or about May 6, 2022.

131.    Defendant Sams and Wood, while acting in a supervisory capacity, explicitly and/or tacitly condoned the unconstitutional actions of Defendant Costello.

132.    The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment and prohibits deliberate indifference to excessive force that are unnecessary,

unjustified, or applied with malicious and sadistic intent for the purpose of punishment and to cause harm.

133.    By using force as described about without efforts to temper the severity of the force and for no justifiable reason, Defendant Costello purposefully or knowingly applied nontrivial force against Mr. Varner that was objectively unreasonable and amounted to punishment, in violation of the Eighth Amendment.

134.    The actions of Defendants Costello were committed under the color of state law, unreasonable, excessive, and deprived Mr. Varner of his clearly established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

135.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions in violation of the Eighth Amendment to the United States Constitution, Mr. Varner seeks to recover damages that compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Humiliation, embarrassment, and degradation; and

D.    All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

136.    Mr. Varner also seeks to recover, under 42 U.S.C. § 1983, the attorneys' fees and costs incurred during the course of this litigation.

137.    Mr. Varner additionally requests that this Court issue a declaratory judgment stating that conditions as set forth herein violated his rights under the Eighth Amendment to the United States Constitution.

138.    Mr. Varner continues to be detained at NCRJ and fears the possibility of once again be subjected to excessive use of force, and thus requests that this Court issue an injunction ordering Defendants to cease all unconstitutional policies and practices currently in effect at NCRJ.

139.    The actions or inactions of Defendants against Mr. Varner were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Varner, thereby justifying an award of punitive damages.

## COUNT III
## VIOLATIONS OF THE FOURTEENTH AMENDMENT
## TO THE UNITED STATES CONSTITUTION
## PROCEDURAL DUE PROCESS
## (42 U.S.C. § 1983)

140.    Mr. Varner incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

141.    Defendants Costello, Tibbs, and Sams, while acting under the color of law, violated Mr. Varner's Fourteenth Amendment right to procedural due process, violating his protected liberty interest in avoiding segregation.

142.    Defendants Costello, Tibbs, and Sams violated Mr. Varner's federal constitutional right, as described and identified herein, by imposing on Mr. Varner "atypical and significant hardship … in relation to the ordinary incidents of prison life" in NCRJ's general population housing units. *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

143.    Defendant Wood, while acting in a supervisory capacity, explicitly and/or tacitly condoned the unconstitutional actions of Defendants Costello, Tibbs, and Sams

144.    The actions of the Defendants were in violation of clearly established law.

145.    On May 3, 2022, it was clearly established that the imposition of such atypical and significant hardship, as compared to the normal incidents of prison life described herein violated the Fourteenth Amendment to the United States Constitution. Determination of atypical and significant hardship is fact specific. *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997). Factors such as the amount of human contact and the amount of time an inmate is let out of his cell are germane to a finding of atypical and significant hardship. *See*, *e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 223-224 (2005) (finding that factors such as prohibition of human contact, one daily hour of exercise in a small room, and indefinite placement combined, give rise to a protected liberty interest in their avoidance); *Incumaa v. Stirling*, 791 F.3d 517, 531-532 (4th Cir. 2015) (finding that "severely restrictive and socially isolating environment of the SMU in contrast to the general population" demonstrated a liberty interested in avoiding such environment).

146.    Plaintiff suffered harm as a result of the imposition of the atypical and significant hardship described herein, including extended exposure to correctional officers known to exhibit patterns of excessive use of force, physical pain, loss of sleep, loss of access to outside communication, anxiety, and fear.

147.    The actions of the Defendants were committed under the color of state law, unreasonable, deliberate, and deprived Mr. Varner of clearly established constitutional rights pursuant to the Fourteenth Amendment to the United States Constitution.

148.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions in violation of the Fourteenth Amendment to the United States Constitution, Mr. Varner seeks to recover damages that compensate him for:

A.    Physical pain and suffering, past and future;

B.      Mental pain and suffering, past and future;

C.      Humiliation, embarrassment, and degradation; and

D.      All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

149.    Mr. Varner also seeks to recover, under 42 U.S.C. § 1983, the attorneys' fees and costs incurred during the course of this litigation.

150.    Mr. Varner additionally requests that this Court issue a declaratory judgment stating that conditions as set forth herein violated his rights under the Fourteenth Amendment to the United States Constitution.

151.    Mr. Varner continues to be detained at NCRJ and has now once again been subjected to atypical and significant hardship. He fears the continuation or repetition of this constitutional violation and thus requests that this Court issue an injunction ordering Defendants to cease all unconstitutional policies and practices currently in effect at NCRJ.

152.    The actions or inactions of Defendants against Mr. Varner were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Varner, thereby justifying an award of punitive damages.

### COUNT IV
### VIOLATION OF THE EIGHTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### PHYSICAL CONDITIONS OF CONFINEMENT
### (42 U.S.C. § 1983)

153.    Mr. Varner incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

154.    Defendants Wood, Costello, Tibbs, and Sams, while acting under the color of law, violated Mr. Varner's Eighth Amendment due process right to be free of cruel and unusual

punishment by imposing "a serious deprivation of a basic human need" through "deliberate indifference to prison conditions on the part of prison officials." *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (citations omitted).

155.    As described herein, Plaintiff has been subjected to conditions, which, in concert, "amounted to a deprivation of a human necessity," *Id*. at 825, including access to basic hygiene products such as toilet paper, access to clean bedding and clothing, regular access to showers, and access to fresh air and sunlight through recreational periods out of a cell. Mr. Varner has also been confined in unit that lacks functional air conditioning and is therefore dangerously hot.

156.    Defendants Wood, Costello, Tibbs, and Sams imposed and/or permitted these conditions despite these conditions not being reasonably related to a legitimate nonpunitive governmental objective.

157.    Defendants Wood, Costello, Tibbs, and Sams were deliberately indifferent to Plaintiff's health, safety, and other basic needs as described herein, having been notified of, and having actual knowledge of, such conditions, and deliberately taking no action to remedy them in a timely or appropriate manner.

158.    The Eighth Amendment to the United States Constitution forbids imposing conditions that amount to cruel and unusual punishment.

159.    The actions of the Defendants were in violation of clearly established law.

160.    During the time period at issue, it was clearly established that the serious deprivation of basic human needs as described herein violated the Eighth Amendment to the United States Constitution. *See*, *e.g.*, *Wilson v. Seiter*, 501 U.S. 294, 304 (identifying food, warmth, and exercise as being among identifiable human needs); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("Conditions … alone or in combination, may deprive inmates of the minimal

civilized measures of life's necessities"); *Dawson v. Kendrick*, 527 F.Supp 1252, 1288-1289 (S.D.W.Va. Aug. 10, 1981) ("The failure to regularly provide prisoners with clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles … constitutes a denial of personal hygiene and living conditions") ; *Kirby v. Blackledge*, 530 F.2d 583, 587 (4th Cir. 1976) (*finding that* "many of the circumstances taken alone reach the level of cruel and unusual punishment, such as … inadequate heating and ventilation.").

161.    Plaintiff suffered harm as a result of the serious deprivation of basic human needs described herein, including pain, loss of sleep, fear, and anxiety.

162.    The actions of the Defendants were committed under the color of state law, unreasonable, deliberate, and deprived Mr. Varner of clearly established constitutional rights, of which a reasonable correctional officer and reasonable jail administrator should have known, pursuant to the Eighth Amendment to the United States Constitution.

163.    As a direct or proximate result of the Defendants' unconstitutional actions or inactions in violation of the Eighth Amendment to the United States Constitution, Mr. Varner seeks to recover damages that compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Humiliation, embarrassment, and degradation; and

D.    All other injuries proven by a preponderance of evidence proximately caused by the Defendants.

164.    Mr. Varner also seeks to recover, under 42 U.S.C. § 1983, the attorneys' fees and costs incurred during the course of this litigation.

165.    Mr. Varner additionally requests that this Court issue a declaratory judgment stating that conditions as set forth herein violated his rights under the Eighth Amendment to the United States Constitution.

166.    Mr. Varner continues to be detained at NCRJ and fears the possibility of being subjected to such conditions again, and thus requests that this Court issue an injunction ordering Defendants to cease all unconstitutional policies and practices currently in effect at NCRJ.

167.    The actions or inactions of Defendants against Mr. Varner were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Varner, thereby justifying an award of punitive damages.

## COUNT V
## ASSAULT AND BATTERY

168.    Mr. Varner incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

169.    By directly threatening the use of force against Mr. Varner and spraying Mr. Varner several times without provocation, Defendant Costello intended to create an apprehension within Mr. Varner of immediate physical harm.

170.    As a result of Defendant Costello's un-tempered and threatening conduct, Mr. Varner felt threatened, and was put in imminent danger of being harmed by multiple bursts of OC pepper spray.

171.    Defendant Costello then intentionally battered Mr. Varner by deploying multiple bursts of OC pepper spray into Mr. Varner's locked cell, intending the OC pepper spray to contact Mr. Varner.

172.    As a direct result of being battered by OC spray, Mr. Varner suffered injuries, including a burning sensation on his skin that lasted for several days, difficulty breathing, and

burning in his eyes, all of which led to a panic attack that made it even more difficult for him to breathe shortly after being battered by OC spray.

173.    In addition to the physical injuries caused by Defendant Costello, Mr. Varner has suffered multiple forms of mental anguish, including but not limited to, fear, nightmares, anxiety, embarrassment, humiliation, and depression.

174.    As a direct and/or proximate result of Defendant's assault and battery, Mr. Varner seeks to recover damages to compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Humiliation, embarrassment, and degradation; and

D.    All other injuries proven by a preponderance of evidence proximately caused by Defendants.

175.    The actions or inactions of Defendants against Mr. Varner were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Mr. Varner, thereby justifying an award of punitive damages.

### REQUEST FOR RELIEF

**WHEREFORE**, based on the above stated facts, Plaintiff Jacob Varner respectfully requests that this Honorable Court award all damages, including attorneys' fees and costs, to Mr. Varner, to compensate him for the injuries he has suffered as the direct and/or proximate result of Defendants' actions. Mr. Varner also seeks an award of punitive damages to deter Defendants from committing similar acts against similarly situated inmates. Finally, Mr. Varner seeks whatever equitable relief this Court deems appropriate, such as, but not limited to, the injunctive and declaratory relief requested above.

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE.**

**Respectfully Submitted,**
**JACOB VARNER,**

By Counsel:

_/s/ Lesley M. Nash_
Lesley M. Nash (WVSB No. 14158)
Lydia C. Milnes (WVSB No. 10598)
Mountain State Justice, Inc.
1029 University Ave., Suite 101
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 326-0189
lesley@msjlaw.org
lydia@msjlaw.org